**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES and EXCHANGE COMMISSION,

                                          Plaintiff,

v.

LIDINGO HOLDINGS, LLC,
KAMILLA BJORLIN,
ANDREW HODGE,
BRIAN NICHOLS, and
VINCENT CASSANO,

                                          Defendants.

---

**Case No. 17-cv-02540 CM**

**PLAINTIFF's MEMORANDUM OF LAW**
**IN OPPOSITION TO THE LIDINGO DEFENDANTS' AND DEFENDANT NICHOLS'**
**MOTIONS TO DISMISS CERTAIN CLAIMS**

**Securities and Exchange Commission**
**100 F Street, N.E.**
**Washington, DC 20549**

**Date:  July 24, 2017**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................1

THE COMPLAINT'S FACTUAL ALLEGATIONS..................................................................2

    Lidingo's Formation And Clientele.................................................................................2

    Role Of Singh And Defendants Bjorlin, Hodge And Nichols At Lidingo ........................3

    The Lidingo Touting Scheme .........................................................................................4

    The Result .....................................................................................................................6

ARGUMENT ........................................................................................................................6

    I.    DEFENDANTS HAVE NOT ESTABLISHED THAT ANY PORTION OF THE
            SEC's CASE IS TIME-BARRED ...............................................................................6

            A.  The SEC's Claims Against The Lidingo Defendants And Nichols Are Not
                  Subject To Any State's Statute Of Limitations Or Repose..............................7

            B.  If The SEC's Claims Against The Lidingo Defendants And Nichols Are
                  Subject To A State Statute Of Repose, New York Is The State To Which The
                  Court Should Look And The SEC's Claims There Are Not Time-Barred .......9

            C.  Even If The Nevada Statute Of Repose Applied It Would Not Bar The SEC's
                  Claims Against Bjorlin, Hodge Or Nichols ...................................................10

    II.  DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN UNDER FED. R. CIV.
           P. 12(b)(6) WITH RESPECT TO COUNTS I-VI (Direct), VIII-XIII
           (Aiding/Abetting), XV (Control) And XVI (20(b))......................................................11

            A.  The Legal Standard Governing Rule 12(b)(6) Motions...................................11

            B.  The Complaint Adequately Pleads Misstatement/Omission Liability Against
                  Lidingo, Hodge, And Nichols In Violation Of Rule 10b-5(b) (Count V) .......12

            C.  The Complaint Adequately Pleads Scheme Liability Against the Lidingo
                  Defendants And Nichols, In Violation Of Rules 10b-5(a) And (c) (Counts IV
                  and VII)........................................................................................................15

            D.  The Complaint Adequately Pleads Violations of Section 17(a)(1), (2) and (3)

(Counts I, II AND III) ........................................................................................19

 E. The SEC Has Adequately Plead Bjorlin's Liability As A Control Person Of Lidingo (Count XV) ...................................................................................20

 F. The Complaint Adequately Pleads, In the Alternative, That Lidingo And Bjorlin Violated Section 20(b) Through Writers (Count XVI) .....................20

  1. The Complaint Satisfies The Elements of A 20(b) Claim .................21

  2. Control Is Not Required For Section 20(b) Liability..........................22

III. THE COMPLAINT'S ALLEGATIONS OF NICHOLS' SCIENTER SATISFY FED. R. CIV. P. 9(b) .............................................................................24

CONCLUSION..........................................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................12

*Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg.*, 302 U.S. 120
(1937) ............................................................................................................8

*Dirks v. SEC*, 463 U.S. 646 (1983) ..................................................................23

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ..........................................12

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ......................................................24

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000)..........23

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319 (S.D.N.Y. 2004)................17

*In re Reserve Fund Secs. and Deriv Litig.*, Nos. 09 MD 2011, 09 Civ. 4346, 2012
WL 12356743 (S.D.N.Y. Oct. 8, 2012) ......................................................19

*In re Smith Barney Transfer Agent Litig.*, 884 F Supp.2d 152 (S.D.N.Y. 2012) .............16

*Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011).............. *passim*

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) .............................................................8

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) .....................................................23

*Marsh v. Rosenbloom*, 499 F.3d 165 (2nd Cir. 2007)........................................9

*Melrose Distillers, Inc. v. United States*, 359 U.S. 271 (1959) .........................9

*Russello v. U.S.*, 464 U.S. 16 (1983)................................................................24

*Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774 (2d Cir.
1984) ............................................................................................................12

*Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon Inc.*, 156 F. Supp. 3d 348 (E.D.N.Y. 2016)...................................................................9

*Sebelius v. Cloer*, 133 S. Ct. 1886 (2013)........................................................23

*SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974) ...............................21, 22, 23, 24

*SEC v. Cole*, No. 12-cv-8167, 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015).................17

*SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219 (11th Cir. 2004).....................8

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)..........................................22

*SEC v. Fischbach Corp.*, 133 F.3d 170 (2d Cir. 1997)........................................................8

*SEC v. Garber*, 959 F. Supp.2d 374 (SDNY 2013).........................................................16

*SEC v. Ginder,* 752 F.3d 569 (2d Cir. 2014) .................................................................25

*SEC v. Huttoe*, No. 96-cv-2543, 1998 WL 34078092 (D.D.C. Sept. 14, 1998)...............18

*SEC v. Kelly*, 817 F. Supp.2d 340 (S.D.N.Y. 2011) ................................................16, 19

*SEC v. Knight*, No. 15-cv-2951, 2017 WL 2438179 (2d Cir. June 7, 2017) ..............15, 19

*SEC v. Landberg*, 836 F. Supp.2d 148 (S.D.N.Y. 2011) ..................................................14

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010).........................................................17

*SEC v. Lorin*, 869 F. Supp. 1117 (S.D.N.Y. 1994)...........................................................8

*SEC v. Lucent Techs.*, 610 F. Supp.2d 342 (D.N.J. 2009) ................................................16

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ...........................................22

*SEC v. Montle*, 53 F. App'x 144 (2d Cir. 2002).............................................................22

*SEC v. Penn*, 225 F. Supp.3d 225 (S.D.N.Y. 2016) ..................................................15, 16

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013).........................15, 16

*SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp.2d 454 (S.D.N.Y. 2004) ...........16

*SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993).....................................................................8

*SEC v. Shehyn*, No. 04 CV 2003 LAP, 2010 WL 3290977 (S.D.N.Y. Aug. 9, 2010) ...................................................................................................22

*SEC v. Simpson Capital Mgmt., Inc.*, 586 F.Supp.2d 196 (S.D.N.Y. 2008).....................17

*SEC v. Strebinger,* 114 F. Supp. 3d 1321 (N.D. Ga. 2015) ...............................................24

*SEC v. Syndicated Food Serv. Int'l, Inc.*, No. 04 CIV. 1303 NGG VMS, 2014 WL 2884578 (E.D.N.Y. Feb. 14, 2014)..............................................................22

*SEC v. Toomey*, 866 F. Supp. 719 (S.D.N.Y. 1992) .............................................................8

*SEC v. Wey,* 15-cv-7116, 2017 WL 1157140 (S.D.N.Y. Mar. 27, 2017)...................16, 25

*Shemian v. Research in Motion, Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ......................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................................11

*Tigert v. Lord, Bissell & Brook*, No. 88-cv-1763, 1989 WL 44719 (D.D.C. Apr. 28, 1989) ...............................................................................................9

*U.S. v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940)...........................................................23

*U.S. v. Evans*, 340 F. App'x 990 (5th Cir. 2009) ...............................................................7

*U.S. v. Saint Louis Univ.*, No. 07-CV-0156-DRH, 2007 WL 4115807 (S.D. Ill. Nov. 16, 2007) ......................................................................................7

*U.S. v. Summerlin*, 310 U.S. 414 (1940) .............................................................................7

## FEDERAL RULES AND STATUTES

15 U.S.C. § 77q(a)(1)....................................................................................................19, 25

15 U.S.C. § 77q(b) ....................................................................................................2, 12, 18

15 U.S.C. § 78j(b) ...........................................................................................................20, 25

15 U.S.C. § 78u(d) ................................................................................................................8

15 U.S.C. § 78t.......................................................................................................... *passim*

17 C.F.R. § 240.10b-5................................................................................................ *passim*

Fed. R. Civ. P. 9(b) ...................................................................................................1, 24 25

Fed. R. Civ. P. 12(b)(6) ..................................................................................1, 11

Fed. R. Civ. P. 17(b) ...........................................................................2, 9, 12, 13

*Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203, 124 Stat. 1376, Section 929P(c) (2010) ...........................................................24

*Securities Reform Act*, Pub. L. No. 94-29, 89 Stat. 97, Section 3 (1975) .........................24

## LOCAL RULES

NRS § 86.071 ...................................................................................................10

NRS §§ 86.411- 86.471 ......................................................................................11

NRS § 86.505(1) ...........................................................................................7, 10

N.Y. LLC Law §§ 701, 703(b) ............................................................................10

## MISCELANEOUS

S. 2693 73rd Cong. § 19(b) (2d Sess. 1934) ..........................................................24

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in opposition to the motions of Defendants Lidingo Holdings, LLC ("Lidingo"), Kamilla Bjorlin ("Bjorlin"), and Andrew Hodge ("Hodge") (collectively, the "Lidingo Defendants") and Defendant Brian Nichols ("Nichols") to dismiss all of the SEC's claims as time-barred pursuant to a Nevada statute, and to dismiss certain claims against the Lidingo Defendants and Nichols pursuant to Fed. R. Civ. P. 12(b)(6) and certain claims against Nichols pursuant to Fed. R. Civ. P. 9(b).  For the reasons that follow, the motions should be denied in their entirety as to each of the moving Defendants.

## PRELIMINARY STATEMENT

The Complaint alleges that, between November 2011 and March 2014, a stock promoter (Lidingo), its founder (Bjorlin), and various employees and writers (including Hodge and Nichols) engaged in a concerted effort to generate bullish articles about the promoter's publicly-traded issuer-clients that appeared to be objective and independent, when in fact, they were promotions paid by the issuer-clients themselves ("Lidingo Stock Touting Scheme").  In total, nearly 500 articles relating to 11 publicly-traded issuers were published on investment websites by participants in the scheme, none of which disclosed the promotional nature of the articles, as was required.  More than half of the articles affirmatively misled the investing public about the paid nature of the articles, and thus the writer's conflict of interest, when they falsely and affirmatively represented that they did not receive compensation.  Complaint dated April 10, 2017 ("Cmpt."), Appendix A ("Appx. A").

The SEC demonstrates below that the moving Defendants' motions are wholly without merit.  The SEC's claims are not barred by a Nevada statute, or any other state statute, because the federal government is suing in its sovereign capacity and is not subject to a state statute of

limitations or repose.  (Point I.)   The Complaint adequately alleges that the Lidingo Defendants and Nichols each are liable as "makers" of at least some of the at-issue statements and omissions (Points II.B, II.D) and that each are liable as participants in the broader scheme through their engagement in independently deceitful acts (Points II.C, II. D).  The Complaint also adequately alleges that Bjorlin is liable as a control person of Lidingo (Point II.E) and Lidingo and Bjorlin are liable, in the alternative, for violating the federal securities laws through others (Point II.F). Finally, the Complaint satisfies Fed. R. Civ. P. 9(b) as to Nichols by providing specific allegations of his motive and opportunity to violate the federal securities laws that also give rise to a strong inference of his fraudulent intent.  (Point III.)  No Defendant seeks to dismiss the SEC's claims under Securities Act 17(b) which will remain in the case regardless of the outcome of this motion.

## THE COMPLAINT'S FACTUAL ALLEGATIONS

### Lidingo's Formation And Clientele

Bjorlin formed Lidingo as a stock promotion company in 2011, with the help of her friend Manish Singh ("Singh"), who at the time not only was the control person of an affiliated stock promotion firm, Lavos LLC ("Lavos"), but also, was the Chief Executive Officer of ImmunoCellular Therapeutics, Ltd. ("IMUC").  Cmpt. ¶¶ 8-9, 13-14, 25.  Singh subsequently became Chief Executive Officer of Lion Biotechnologies, Inc. ("LBIO").  Cmpt. ¶¶ 14, 18.

Both IMUC and LBIO contracted with Lidingo for stock promotion services while Singh was their CEO.  Cmpt. ¶¶ 14, 17-18, 25, Appx. A.  In addition , Lidingo performed promotional work for at least 9 other issuers during the relevant period.  Cmpt. ¶¶ 15-16, 19, Appx. A. Lidingo was paid in cash by some of its issuer-clients, and was paid a combination of cash and stock by others, including Galena Biopharma, Inc. ("GALE").

### Role Of Singh And Defendants Bjorlin, Hodge And Nichols At Lidingo[1]

Singh found clients for Lidingo, split compensation with Lidingo when Lidingo assisted with promotions for Lavos clients, and guided Bjorlin in the conduct of her business, including by providing ideas for articles, occasionally editing articles, and directing where and when articles should be published.  Cmpt. ¶¶ 8, 13-14, 28-29, 70, 75.

Bjorlin was Lidingo's sole managing member. Cmpt. ¶ 8. At all relevant times, she ran Lidingo's day-to-day operations, which included, signing stock promotion contracts with issuers, interfacing with issuers about article topics and content, locating and hiring writers, assigning articles, interfacing with writers on their assignments, telling writers when and often where to publish articles, and paying writers. Cmpt. ¶¶ 27-29, 40-46, 80.

Hodge, one of Lidingo's employees, was involved in Lidingo's day-to-day operations since December 2011.  Cmpt. ¶¶ 10, 25.  Among other things, he recruited writers, assigned articles, edited articles, provided direction to writers on when and where to publish articles, and assisted Lidingo with recordkeeping.  Cmpt. ¶¶ 10, 25, 49, 51-52, 94-97, 101.  Hodge also published articles for Lidingo clients.  Cmpt. ¶ 50, Appx. A.

Nichols became a writer for Lidingo in or about February 2012 and remained so through at least March 2014.  Cmpt. ¶ 11. Initially he was compensated on a per-article basis but later was paid a bi-weekly salary.  Cmpt. ¶ 54.  He accepted assignments from Bjorlin and Hodge, wrote articles about Lidingo clients, and published them.  Cmpt. ¶¶ 41-42, 46-47, 49, 54-60, 80, 88-89, 100-101.  Nichols also ghost-wrote (*i.e.*, wrote not for attribution) articles that he submitted to Lidingo, which Lidingo published under its own pseudonyms.  Cmpt. ¶¶ 57-58, 82.

---

[1]  Defendant Cassano has not moved to dismiss the SEC's claims against him.  Accordingly, this memorandum does not address the Cassano-specific allegations of the Complaint, except as incidental to discussing the generic scheme.

When investors started to suspect that the same writers were behind multiple pseudonyms, Nichols strategized with Bjorlin and Hodge about new ways for Lidingo to do business, and suggested that it create new accounts registered to new pseudonyms, and to publish articles under those new pseudonyms.  Cmpt. ¶ 58.  Independent of his work for Lidingo, Nichols also traded in the stocks of some of the issuers he wrote about for Lidingo.  Cmpt. ¶¶ 59-60.

**The Lidingo Touting Scheme**

Central to the scheme was Bjorlin and Hodge's agreement with Singh, and subsequently writers (including Nichols), that the articles would not reveal that the writers had been compensated because such a revelation could, among other things, "discredit the validity of the articles" and "dent [the] credibility" of the writers.  Cmpt. ¶¶ 26, 33-39.  To hide the promotional nature of the published articles, Bjorlin and Hodge and writers (including Nichols) engaged in a number of deceitful activities:

*First*, before hiring a prospective writer, Bjorlin and Hodge discussed disclosure with the writer and, if he or she planned to disclose compensation, they did not hire the writer.  Cmpt. ¶ 34.  *Second*, Bjorlin and Hodge asked certain writers to sign a non-disclosure agreement that prohibited the writer from disclosing his or her compensation.  Cmpt. ¶¶ 34, 37.  *Third*, Bjorlin and Hodge routinely reminded writers not to disclose compensation.  Cmpt. ¶¶ 37-38.  *Finally*, Lidingo itself, through Hodge and other employees, published a significant number of ghost-written articles under multiple of its own pseudonyms, and did not disclose its compensation or relationship with the issuers.  Cmpt. ¶¶ 31-33, 50, 57, 75, 79, 91, 93, 99.

In furtherance of their scheme, starting in the summer of 2012, Lidingo, through Bjorlin and Hodge, and Lidingo's writers, began to circumvent a newly-announced publication policy of Seeking Alpha, the website where the vast majority of articles at issue were published.  Cmpt. ¶¶

4

20, 36, 39, 68, Appx. A.  Specifically, Seeking Alpha announced in June 2012 that it would cease publishing articles for which compensation had been received.  Cmpt. ¶ 20.  To weed out compensated promotional pieces after its policy went into effect, Seeking Alpha required prospective publishers to check a box at the time of submission, that represented either (i) "the author is receiving compensation to write this article, or has a business relationship with a company whose stock is mentioned in this article," or (ii) "[t]he author is not receiving compensation for [this article]" and "has no business relationship with any company whose stock is mentioned in this article."  Cmpt. ¶ 20.   Lidingo and its writers counter-acted this policy by checking the box that affirmatively (and falsely) stated they were not paid to write the articles and had no business relationship with any issuer whose stock was covered in the articles.  Cmpt. ¶¶ 26, 32, 39, 72, Appx. A (reflecting that every at issue article published on Seeking Alpha's website from at least August 2012 onward affirmatively stated that the article was not compensated).  When Seeking Alpha became suspicious that certain writers were compensated for their articles, it contacted the writers, who contacted Bjorlin, who instructed the writers to continue publishing on Seeking Alpha's website.  Cmpt. ¶ 43.

Additionally, from at least November 2012 through March 2014, Lidingo, through Bjorlin and Hodge, and various Lidingo writers, circumvented Seeking Alpha's prohibition on accountholders having more than one account.  Cmpt. ¶ 21.  To create the false impression of heightened interest in Lidingo's issuer-clients by writers, and to appeal to a wider investor audience, Lidingo and some of its writers created multiple accounts, each associated with a different name and profile, which enabled in the same writer(s) to publish under multiple pseudonyms.  Cmpt. ¶¶ 21, 31, 58, Appx. A.  Lidingo itself was the most deceptive.  It not only created multiple accounts under multiple fake names, but also, it manufactured false profiles for

the names, in an effort to boost the credibility of articles published under those names.  Cmpt. ¶¶ 2, 31-32 (identifying ten Lidingo-created profiles, which were behind at least 140 of the at-issue articles in this case) and Appx. A (column titled "Pseudonym").  Nichols also circumvented this policy.  Cmpt. ¶¶ 11, 58, 91, 93, 99, Appx. A (compare column entitled "Writer/Publisher" identifying "Nichols, Brian" and "Lidingo Nichols" with column entitled "Pseudonym").

### The Result

The result of the foregoing activity was that, between November 2011 and March 2014, Lidingo and its writers, including Nichols, published nearly 500 articles funded by 11 of Lidingo's issuer-clients.  Cmpt. ¶ 69, Appx. A.  Nichols personally wrote and published at least 90 of the at-issue articles under his own name and wrote at least 25 additional articles that Lidingo published under its own pseudonyms.  Cmpt. ¶ 11, Appx. A.  None of the articles in the case disclosed the promotional nature of the articles or the amount that the issuer had paid as required.  Cmpt. Appx. A (column titled "Omission re Receipt of Payment").  More than half of the articles (including at least 50 written by Nichols) affirmatively misled the investing public about the paid nature of the articles, and thus the writers' conflict of interest, because they falsely and affirmatively represented that the writers did not receive compensation.  Cmpt. Appx. A (column titled "Affirmative Misrep. re Receipt of Payment").

### ARGUMENT

## I. DEFENDANTS HAVE NOT ESTABLISHED THAT ANY PORTION OF THE SEC's CASE IS TIME-BARRED

The Lidingo Defendants, joined by Defendant Nichols, seek to dismiss the SEC's entire case against them on grounds that it was brought more than two years after Lidingo, a Nevada

limited liability company, was dissolved.[2]  Relying on the Nevada Limited Liability Company

("LLC") Act – specifically a statute of repose reflected in Nevada Revised Statutes ("NRS") §

86.505(1) – they contend that (i) Lidingo no longer has the capacity to be sued by the SEC and

(ii) Bjorlin, Hodge, and Nichols, as members, managers or employees of Lidingo, can no longer

be sued either since their liability would be derivative of Lidingo's.  Lidingo Br. at 3-6.; Nichols

Br. at 1-2.[3]  Their arguments should be rejected for the multiple reasons that follow.

### A.   The SEC's Claims Against The Lidingo Defendants And Nichols Are Not Subject To Any State's Statute Of Limitations Or Repose

It is well-established that the United States and its agencies are not bound by state

statutes of limitation or statutes of repose in enforcing the law when it is acting in its sovereign

capacity to vindicate a public right.  This is because, "[w]hen the United States becomes entitled

to a claim acting in its governmental capacity, and asserts its claim in that right, it cannot be

deemed to have abdicated its governmental authority so as to become subject to a state statute

putting a time limit on enforcement."  *U.S. v. Summerlin*, 310 U.S. 414, 416 (1940).[4]

The Lidingo Defendants and Nichols do not (and cannot) dispute that, here, the federal

government was acting in its sovereign capacity to vindicate a public right when the SEC filed

---

[2]  The parties do not dispute that Lidingo filed articles of dissolution with the Nevada Secretary of State on October 14, 2014, and that the dissolution became effective that day.  Declaration of Edward Gartenberg dated June 19, 2017 ("Gartenberg Dec.") ¶ 2.

[3]  The Memorandum of Law of Defendants Lidingo Holdings, LLC, Kamilla Bjorlin and Andrew Hodge in Support of Motion to Dismiss the Complaint, dated June 19, 2017 is hereinafter cited as "Lidingo Br. at __." The Memorandum of Law of Defendant Brian Nichols in Support of Motion to Dismiss Complaint, served on June 24, 2017, but not yet filed with the Court, is hereinafter cited as "Nichols Br. at __."

[4]  *See also U.S. v. Evans*, 340 F. App'x 990, 993 (5th Cir. 2009) (the effect of a statute of repose – which bars a claim that is untimely – is equivalent to that of a statute of limitations and thus is treated the same under *Summerlin*); *U.S. v. Saint Louis Univ.*, No. 07-CV-0156-DRH, 2007 WL 4115807, at *4 (S.D. Ill. Nov. 16, 2007) (similarities between statutes of repose and limitations eclipse their differences).

this action.  Congress created the SEC as an independent regulatory agency having the primary

responsibility to enforce the federal securities laws and protect the integrity of the nation's

capital markets.  Toward that end, in Exchange Act Section 21(d), Congress gave the SEC broad

authority to commence litigation in federal court to enjoin any person who appears engaged in or

about to engage in acts or practices constituting a violation of the federal securities laws.  *See* 15

U.S.C. § 78u(d).  When the SEC seeks, obtains and collects monetary judgments in such actions,

it is not acting as a mere proxy for private parties.  *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017)

(noting that there is no statutory command that the SEC distribute monetary judgments to private

investors, it is "within the court's discretion to determine how and to whom the money will be

distributed," and often the amounts end up in the United States Treasury) (*quoting SEC v.

Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997)).  For these reasons, courts have found that,

when the SEC brings an enforcement action like this, the government is acting in its sovereign

capacity to vindicate a public right.  *See SEC v. Lorin*, 869 F. Supp. 1117, 1127-30 (S.D.N.Y.

1994).  The SEC thus is not subject to any state statute of limitations or repose.  *SEC v. Toomey*,

866 F. Supp. 719, 724 (S.D.N.Y. 1992).[5]

    The cases relied on by the Lidingo Defendants and Nichols are inapposite in that they do

not concern claims by the United States or a federal agency acting in its sovereign capacity to

enforce its statutory mandate against a dissolved corporation.  Lidingo Br. at 3 (citing *Chicago

Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg.*, 302 U.S. 120, 127-29 (1937)

---

[5]  *See also SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993) (noting that "Congress entrusted the
Commission with the vital mission of ensuring the honesty and fairness of the capital markets"
and that "the entire purpose and thrust of [an SEC] enforcement action is to expeditiously
safeguard the public interest by enjoining securities violations") (internal quotations omitted);
*SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1224 (11th Cir. 2004) ("When the
SEC sues to enforce the securities laws, it is vindicating public rights and furthering public
interests, and therefore is acting in the United States' sovereign capacity.")

(shareholders of company dissolved by court order could not self-revive company and invoke the powers of the bankruptcy court to claw back foreclosed corporate assets); *Marsh v. Rosenbloom*, 499 F.3d 165, 177-181 (2nd Cir. 2007) (CERCLA claims asserted by state government barred because CERCLA six year statute of limitations did not preempt Delaware's three year statute of limitations regarding a dissolved corporation's capacity for suit).  Equally inapposite, *Melrose Distillers, Inc. v. United States*, 359 U.S. 271, 272-74 (1959), was based on a federal statute (the Sherman Act) that expressly required an indicted "person" to "exist" at the time of indictment, whereas the federal securities laws have no such requirement.

### B. If The SEC's Claims Against The Lidingo Defendants And Nichols Are Subject To A State Statute Of Repose, New York Is The State To Which The Court Should Look And The SEC's Claims There Are Not Time-Barred

Even if, *arguendo*, it is appropriate to look to a state statute to determine whether the SEC's claims against Lidingo and Bjorlin are timely or appropriate, it is New York's LLC Act, not Nevada's, which would govern the issue.  Rule 17 of the Federal Rules of Civil Procedure provides that (i) in determining a *corporation's* capacity to be sued, the Court should look to "the law under which it was organized" and (ii) for all other entity parties, the Court should look to "the law of the state where the court is located."  Fed. R. Civ. P. 17(b)(2), (3).  Lidingo is an LLC, not a corporation.  Accordingly, if it is appropriate to look to a state statute to determine whether the SEC has capacity to sue Lidingo, it is the catchall provision of Fed. R. Civ. P. 17(b) that applies and this Court should look to New York's LLC Act.  *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon Inc.*, 156 F. Supp. 3d 348, 358-59 (E.D.N.Y. 2016) (Florida LLCs were subject to catchall provision and standing was analyzed under New York LLC Act).[6]

---

[6]  *See also, e.g., Tigert v. Lord, Bissell & Brook*, No. 88-cv-1763, 1989 WL 44719, at *1 (D.D.C. Apr. 28, 1989) (Fed. R. Civ. P. 17(b) requires "partnership's capacity to be sued be determined

Unlike the Nevada statute of repose, New York's LLC Act does not have a time limit for suing a dissolved limited liability company; nor does winding down a New York LLC affect the liability of its members.  *See* N.Y. LLC Law §§ 701, 703(b).  It is for this additional reason that Lidingo's and Bjorlin's standing and capacity arguments should be rejected.[7]

### C.   Even If The Nevada Statute Of Repose Applied It Would Not Bar The SEC's Claims Against Bjorlin, Hodge Or Nichols

Even if the Nevada statute upon which the Lidingo Defendants and Nichols rely applies, which it does not, the statute would only bar the SEC's claims against Lidingo and any derivative claims against Bjorlin.  It would not bar claims against Bjorlin individually as a primary violator, nor would it bar any claims against Hodge or Nichols.  The Nevada statute, on its face, applies only to Nevada LLCs, its managers, and its members. NRS § 86.505(1).  Bjorlin was the only member or managing member of Lidingo.[8]  Cmpt. ¶ 8.  Thus, any derivative claims against Bjorlin as a member of Lidingo would be barred by the Nevada statute.  But, contrary to Bjorlin's argument (Lidingo Br. at 6), the SEC's Complaint does not solely charge Bjorlin with derivative liability.  Only counts VIII through XV (the aiding and abetting and control person claims) were asserted against Bjorlin in a derivative capacity.  Cmpt. ¶¶ 102-113, 117-169.  Accordingly, if the Nevada statute of repose applies, it would *not* affect the primary liability

---

in accordance with the law of the forum state *as it relates to partnerships,"* not in accordance with the choice of law principles of the forum state) (emphasis added).

[7]  This result – *i.e.*, whereby the SEC may proceed against Lidingo if New York law applies but not if Nevada LLC law applies – only further emphasizes why the federal government should not be subject to state statute of limitation or repose when suing in its sovereign capacity.  The SEC's ability to enforce the federal securities laws uniformly throughout the land would be severely hampered if it were subject to different statutes of limitation or repose based on the type of defendant, state of organization and state where the case is filed.

[8]  The term "manager" under the Nevada LLC Act has a very specific meaning.  It is the person or persons designated in or selected pursuant to the articles of organization or operating agreement of the LLC to manage the LLC.  NRS § 86.071.

claims made against Bjorlin in Counts I, III through IV, VI through VII, or XVI.  The statute

would not bar any claims against Hodge and Nichols.  Hodge was an "employee" and Nichols

was a "writer," and thus they were not "members" of Lidingo (Cmpt.¶¶ 9, 10, 11, 58; Lidingo

Br. at 5; Nichols Br. at 2);[9] so, the Nevada statute, if it applied, would not bar any of the SEC's

claims against Bjorlin in her individual capacity, or against Hodge and Nichols as employees of

Lidingo.[10]

## II.   DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN UNDER FED. R. CIV. P. 12(b)(6) WITH RESPECT TO COUNTS I-VI (Direct), XV (Control) And XVI (20(b)

### A.   The Legal Standard Governing Rule 12(b)(6) Motions

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "accept all

[non-conclusory] factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "draw[] all reasonable inferences in the plaintiff's

favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The motion

must be denied unless the plaintiff's claim is not "plausible on its face," that is, unless the

---

[9]  The term "member" under the Nevada LLC Act also has a very specific meaning.  A "member" is the owner of a member's interest (*i.e.* a share of the economic interest of the LLC, including profits, losses, and distributions of assets) or a non-economic member.  The terms "member" and "employee" are not synonymous under the Nevada statute.  *See* NRS §§ 86.411-86.471 (concerning indemnification of "manager, member, employee or agent").  Hodge and Nichols do not contend they were "members."  Further, though Nichols characterizes himself as an "employee" (Nichols Br. at 2), he was not; the Complaint alleges he was a "paid writer" (*i.e.* independent contractor).  Cmpt. ¶ 11.  Either way, he was not a "member" and not covered by the Nevada statute.

[10]  Recognizing that the Nevada statute does not apply to "employees" or "independent contractors," Hodge and Nichols appeal to the Court's sense of equity and argue instead that it would be incongruous to allow claims against them to survive if claims against the LLC's members and managers are time barred.  Lidingo Br. at 6; Nichols Br. at 2.  This argument too only further supports why SEC enforcement actions should not be subject to a state statute of limitations or repose.  Coverage would vary from state to state, and persons not covered would be forced to ask a court to exercise its discretion in the name of equity, thus making uniform enforcement of the federal securities laws impossible.

plaintiff's allegations, analyzed collectively, do not "raise a right to relief above the speculative

level . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*,

556 U.S. 662, 678-79 (2009) ("[T]he plausibility standard is not akin to a 'probability

requirement' . . . .") (citing *Twombly*, 550 U.S. at 557); *Ryder Energy Distrib. v. Merrill Lynch*

*Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (court's task to "'assess the legal feasibility

of the complaint, not to assay the weight of the evidence which might be offered in support

thereof'") (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

     **B.**    **The Complaint Adequately Pleads**
            **Misstatement/Omission Liability Against Lidingo,**
            <u>**Hodge, And Nichols In Violation Of Rule 10b-5(b) (Count V)**</u>

Lidingo, Hodge, and Nichols contend that the SEC's claims under Rule 10b-5(b), 17

C.F.R. § 240.10b-5(b), fail because, according to them, the Court cannot infer from the

Complaint's allegations that they were "makers" of the at-issue statements and omissions.

Lidingo Br. at 6-7 (contending that the writers were makers); Nichols Br. at 6 (contending that

Lidingo, Bjorlin and Hodge were makers).  Specifically, relying on language in *Janus Capital*

*Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011), that, ordinarily, a defendant does not

"make" a statement simply by preparing or publishing it on behalf of another, *id.* at 142, Lidingo,

Hodge and Nichols claim that it is not enough for the Complaint to allege that they published the

at-issue articles.

The critical flaw in their argument is that the duty to disclose in this case did not arise

until the time of publication.  The source of that duty is Securities Act Section 17(b), which

states, in pertinent part, that:

> It shall be unlawful for any person ... to publish, give publicity to, or circulate
> any notice, circular, advertisement, newspaper, article, letter, investment service,
> or communication, which, though not purporting to offer a security for sale,
> describes such security for a consideration received, or to be received, directly or

indirectly, from an issuer … without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b).  The duty to disclose thus belongs to the person who publishes, gives publicity to or publicly circulates the at-issue statement.  Accordingly, in the context of this case, allegations that an individual or entity "published" an article equate to allegations that the individual or entity was a "maker" of the statements or omissions in that article, or at least such allegations create the inference that the person or entity who published was the "maker."

Here, given that the duty of disclosure did not arise until the time of publication, the Complaint divides the articles into two categories -- (i) articles that were *written* and *published* by writers, including Nichols, under their own names or under the writers' own pseudonyms and (ii) articles that were *ghost-written* for Lidingo but were *edited* and *published* by Lidingo under Lidingo's pseudonyms -- and seeks to hold each defendant liable only as the "maker" of the content of articles which they *published*.[11]

For the reasons that follow, the SEC's Rule 10b-5(b) claims against Lidingo, Hodge and Nichols should not be dismissed:

*Nichols*:  Nichols argues that he is not a "maker" of any misstatements because, in his view, the Complaint alleges that he acted at Lidingo's direction and had no ultimate authority over any alleged statement or omission.  Nichols Br. at 6.  But the Complaint alleges, and in Appx. A specifically identifies, more than 90 articles that Nichols not only wrote, but also published, under his name.  Cmpt. ¶¶ 11, 41, 47, 49, 55, 80-81, 88, 100, Appx. A (see "Actual Author's Name" column).  Nothing more is needed to establish, at the pleading stage, that

---

[11]   The Complaint does not charge any writer with direct violations of Rule 10b-5(b) for ghost-writing articles that Lidingo subsequently published under its own pseudonyms.  This charging distinction was made in response to the Supreme Court's admonishment in *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011), that, ordinarily, a defendant does not 'make' a statement simply by preparing or publishing it on behalf of another.  *Id.* at 142.

Nichols was the "maker" of the statements in *at least* those 90+ articles.  *See SEC v. Landberg*, 836 F. Supp.2d 148, 154 (S.D.N.Y. 2011) ("[o]rdinarily, 'attribution within a statement or implicit from surrounding circumstances is strong evidence' that a statement was made by – and only by – the party to whom it is attributed.") (quoting *Janus,* 564 U.S. at 142-43).

*Hodge*:  The sole argument Hodge makes in support of his request that the Court dismiss the SEC's Rule 10b-5(b) claim is that "[n]owhere in the Complaint is there any allegation that Hodge *wrote* any of the articles."  Lidingo Br. at 7.  But, as mentioned, in the context of this case, it is reasonable to conclude that the person or entity that is alleged to have *published* an at-issue article is the "maker" given that the disclosure obligation did not arise until the time of publication.  Therefore it is reasonable to infer that Hodge was the "maker" of the content of the at least 10 articles he allegedly *published* under various Lidingo pseudonyms, and the 35 articles that Lidingo allegedly published under the name A. John Hodge.[12]  Cmpt. ¶¶ 32, 48, 50, 79, 91, 93, Appx. A (identifying "Lidingo/Hodge" in column titled "Writer/Publisher" and identifying "A. John Hodge" in column titled "Pseudonym").

*Lidingo*:  Like Hodge, Lidingo too asks this Court to dismiss the SEC's Rule 10b-5(b) claim on grounds that there is no allegation that Lidingo or its employees "wrote" any of the articles.  Lidingo Br. at 6-7.  Its argument misses the point and fails for the same reason that Hodge's argument fails.  The Complaint alleges that Lidingo *published* at least 140 articles under its own pseudonyms.  Cmpt. ¶¶ 31-32, 45, 48, 50, 57-58, 75, 77, 79, 85, 89, 91, 93, 96, 97, 99, Appx. A.  These are not merely "conclusory characterization[s]," as Lidingo contends (Lidingo

---

[12]  Hodge declined to testify in the SEC's investigation based on his Fifth Amendment privilege against self-incrimination.  Cmpt. ¶10.  Thus the SEC was unable to explore what his position is with respect to articles that Lidingo published under the name A. John Hodge.  Since his name is A. John Hodge, it is reasonably inferable that he was the Lidingo employee who published and thus was responsible for the statements and omissions in those articles.

Br. at 7), but rather are particularized allegations that identify the specific pseudonyms under which Lidingo published, as distinguished from pseudonyms under which writers published. The Court must accept these allegations as true at the pleading stage.

### C.  The Complaint Adequately Pleads Scheme Liability Against The Lidingo Defendants And Nichols, In Violation Of Rules 10b-5(a) And (c) (Counts IV and VII)

The Lidingo Defendants and Nichols do not dispute that the Complaint contains allegations sufficient to establish each of the required elements of a claim under Rules 10b-5(a) and (c) -- that, in connection with the purchase or sale of a security, Lidingo, Bjorlin, Hodge and Nichols each (i) committed a manipulative or deceptive act, (ii) in furtherance of an alleged scheme to defraud, (iii) with scienter.  *See, e.g., SEC v. Penn*, 225 F. Supp.3d 225, 235 (S.D.N.Y. 2016) (citing cases).  Instead they posit that, as a matter of law, a defendant cannot be liable under any fraud theory where he or she orchestrates a scheme, the *primary purpose and effect* of which is to make a public misrepresentation or omission, but does not him- or herself "make" any misstatements.[13]  Lidingo Br. at 9-10; Nichols Br. at 6-7.  But, *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011), and its progeny, did not foreclose claims under Rules 10b-5(a) or (c) against participants in a scheme involving misrepresentations, or even a scheme whose end result is a misrepresentation.[14]  Accordingly, this argument fails.

---

[13]  The SEC did not assert misrepresentations claims against Bjorlin under Rule 10b-5(b), but such claims were asserted against Lidingo, Hodge, and Nichols, which the SEC demonstrated in Point II.B., *supra*, were "makers" of the misrepresentations and omissions in at least some of the nearly 500 at-issue articles.

[14]  The Second Circuit, at least twice since *Janus*, has recognized that schemes often involve, and even have as their primary purpose, misrepresentations and omissions.  In such cases, the Second Circuit has upheld findings of liability under all three subsections of Rule 10b-5, not just Rule 10b-5(b).  See *SEC v. Knight*, No. 15-cv-2951, 2017 WL 2438179, at *2 (2d Cir. June 7, 2017) (Summary Order) (jury could reasonably have concluded that Knight was liable under Rules 10b-5(a), (b) or (c) for misstatements and omissions in two confidential offering memoranda used in unregistered stock offerings regardless of whether Knight was a maker or not); *SEC v.*

*SEC v. Kelly*, 817 F. Supp.2d 340 (S.D.N.Y. 2011), which the Lidingo Defendants and Nichols rely on but mischaracterize, makes clear that scheme liability can attach to a defendant based on his performance of an "inherently deceptive act that is distinct from an alleged misstatement." *Id.* at 344.[15]  The Lidingo Defendants and Nichols ignore this standard.  Lidingo Br. at 9-10; Nichols Br. at 6-7.[16]  Inherently deceptive conduct is not the same thing as inherently unlawful conduct.  Indeed, many cases have found conduct to be inherently deceptive when, like here, the conduct was otherwise lawful but designed to prevent detection of the fraud or to circumvent a procedure in order to facilitate the fraud.[17]  Such conduct is separate and distinct

---

*Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) (finding, after bench trial, that defendants' activities independently satisfied the requirements of liability under Rules 10b-5(a), (b), and (c) where, beyond communication of the trades themselves to clearing brokers, defendants engaged in coordinated activity to locate brokers that would permit the trades and transmit instructions).

[15]  The acts in *Kelly* (engineering and booking transactions that resulted in improper recording of revenues) were not inherently deceptive or separate and distinct from the subsequent public misrepresentations (misstated revenues).  *Kelly*, 817 F. Supp.2d at 344; *see also SEC v. Garber*, 959 F. Supp.2d 374, 380-81 n.47 (SDNY 2013) (explaining *Kelly*).

[16]  The cases upon which this Court relied in *Kelly* do not support a reading of *Kelly* that would foreclose scheme liability where the "primary purpose and effect" of the scheme is to make a public misrepresentation or omission.  For example, in *SEC v. Lucent Techs.*, 610 F. Supp.2d 342 (D.N.J. 2009), the court rejected as "nonsensical" the defendant's argument that there can be no violation of Rule 10b-5(a) or (c) if the primary purpose or goal of a scheme is to facilitate a misrepresentation.  *Id.* at 359-61 (noting that, under such a standard, "the architects of a fraudulent scheme, whose deception is communicated to the investing markets through an unattributed misstatement in a public filing, would be immune from liability"); *see also, e.g., SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp.2d 454, 467 (S.D.N.Y. 2004) (expressing view that scheme liability may be applicable where the fraudulent activity involves *some* conduct other than participating in a scheme to make a material misrepresentation or omission, but not where the individual merely facilitated preparation of material misrepresentations).

[17]  *SEC v. Wey,* No. 15-cv-7116, 2017 WL 1157140, at *14 (S.D.N.Y. Mar. 27, 2017) (moving gifted shares into brokerage accounts with the intent of making it more difficult for NASDAQ to evaluate company's shareholder base was inherently deceptive and not merely a reiteration of the lie to NASDAQ, though it facilitated the lie); *see also, e.g., SEC v. Penn*, 225 F. Supp.3d 225, 235-36 (S.D.N.Y. 2016) (routing funds through a third-party to disguise ultimate recipient of funds was inherently deceptive); *In re Smith Barney Transfer Agent Litig.*, 884 F Supp.2d 152, 160-61 (S.D.N.Y. 2012) (creating in-house transfer agent not deceptive in and of itself but doing

when it goes beyond or is in addition to the misrepresentation or omission.[18]  Moreover, a defendant can be liable under Rules 10b-5(a) and (c) for inherently deceptive conduct in one period that gives rise to a misstatement in a later period.[19]

The Lidingo Defendants and Nichols not only ignore the relevant pre and post-*Kelly* cases, but also the Complaint's specific allegations of deceitful conduct.  The Complaint adequately pleads conduct by the Lidingo Defendants and Nichols that go beyond misrepresentations and omissions and were inherently deceptive. Specifically, although the alleged scheme ended with the publication of nearly 500 promotional articles that were disguised as independent analyses that were intended to move the issuers' stock price, the Complaint alleges that Lidingo, Bjorlin and Hodge facilitated their scheme through deceitful conduct such as: (i) hiring only writers who said they would not disclose compensation and not using writers again if they did disclose (Cmpt. ¶¶ 33-38, 67-68, 76, 87);[20] and (ii) strategizing about and publishing ghost-written articles themselves under multiple pseudonyms that used false and inflated credentials in order to create the appearance of interest in Lidingo's issuer-clients and to

---

so to conceal scheme designed to channel transfer against costs away from fund was inherently deceptive).

[18]  *SEC v. Cole*, No. 12-cv-8167, 2015 WL 5737275, at *8 (S.D.N.Y. Sept. 19, 2015) (engagement partner's acts of backdating and fabricating audit work papers and omitting audit steps were inherently deceptive acts separate from audit opinion on alleged misleading financial statements).

[19]  *SEC v. Lee*, 720 F. Supp. 2d 305, 318, 324-325 (S.D.N.Y. 2010) (actions undertaken in prior periods, such as "u-turning" commodity prices between brokerage houses," trades, which ultimately enabled defendant to record higher values and misrepresent his losses, were deceptive conduct taken to create the appearance of substance when substance was lacking) (citing *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319, 335 (S.D.N.Y. 2004)).

[20]  *See SEC v. Simpson Capital Mgmt., Inc.*, 586 F.Supp.2d 196, 208 (S.D.N.Y. 2008) (defendants, like Lidingo, Bjorlin and Hodge, orchestrated a fraudulent scheme, and engaged in deceitful conduct which included, among other things, identifying brokers willing to participate in the scheme, dealing only with brokers who agreed to place late trades, and ceasing to do business with brokers who would not continue to place late trades).

boost the credibility of the articles (Cmpt. ¶¶ 21, 31-32, 58, 97).  The Complaint also alleges that Bjorlin (i) knew about Seeking Alpha's policy and instructed writers to continue publishing there and to lie about their receipt of compensation and (ii) had a secret side agreement with at least one CEO about stock price goals and sought and sometimes obtained bonuses and stock option grants when Lidingo's articles reached those goals.  Cmpt. ¶¶ 43, 80-81, 83-84, 86, 89.  As for Nichols, in addition to his strategizing with Bjorlin and Hodge about the use of pseudonyms and fake credentials (Cmpt. ¶ 58), the Complaint alleges that, in order to circumvent Seeking Alpha's policy against compensated articles, he deceived Seeking Alpha by informing them that he was not compensated (Cmpt. ¶¶ 11, 20, 41, 47, 49, 55, 58, 85, 88, 100, 101, Appx. A); if he had not first deceived Seeking Alpha, his articles would not have been accepted for publication.[21] Additionally, the Complaint alleges that Nichols acted contrary to the recommendation in certain of his articles when he purchased shares of issuers he wrote about prior to publication and sold such shares immediately thereafter.  Cmpt. ¶¶ 59-60.  The foregoing conduct falls squarely within the rubric of scheme liability.[22]

---

[21]  The deception of Seeking Alpha is separate and apart from the ultimate misrepresentations and omissions in the case.  Specifically, as alleged, writers first had to satisfy a Seeking Alpha policy that prohibited the publication of compensated articles; they represented their compliance with that policy by checking a box during the submission process that indicated they were not compensated.  Cmpt. ¶ 20.  After the article was accepted by Seeking Alpha, the disclosure requirements of Securities Act Section 17(b) kicked in, which, as mentioned, imposes a duty to disclose in each article the direct or indirect receipt (past or prospective) of consideration from an issuer and the amount.  15 U.S.C. § 77q(b). Accordingly the deceit of Seeking Alpha, and the additional deceitful conduct described in the text, is distinct from the ultimate misrepresentations and omissions at issue in the case.

[22]  *See, e.g., SEC v. Huttoe*, No. 96-cv-2543, 1998 WL 34078092, at *4-6 (D.D.C. Sept. 14, 1998) (finding, on motion to for summary judgment, no material facts in dispute concerning promoter's non-disclosure of paid promotional nature of articles appearing in newsletter violated Section 10(b)).

**D.     The Complaint Adequately Pleads
          <u>Violations of Sections 17(a)(1), (2) and (3) (Counts I, II And III)</u>**

The Lidingo Defendants and Nichols argue that the SEC's Securities Act Section 17(a)

claims must fail against them for all of the reasons that the SEC's Rule 10b-5 claims must fail.

Lidingo Br. at 10-11; Nichols Br. at 7.  But, Sections 17(a)(1) and (3) are identical to Rules

10b-5(a) and (c); therefore, for all of the reasons stated in Point II.C., *supra*, the Court should

also find that the Complaint adequately states a claim against the Lidingo Defendants and

Nichols under  Sections 17(a)(1) and (3).  The Court should also find that the Complaint

adequately states a claim against Lidingo, Hodge and Nichols under Section 17(a)(2),[23] but for

different reasons.  First, Lidingo and Hodge have not raised a valid legal argument.  Lidingo Br.

at 10.  Section 17(a)(2) is not identical to Rule 10b-5(b) and thus the SEC is not required to plead

that Lidingo and Hodge are "makers" of the alleged misstatements and omissions to maintain its

Section 17(a)(2) claims against them.  *See, e.g., In re Reserve Fund Secs. and Deriv Litig.*, Nos.

09 MD 2011, 09 Civ. 4346, 2012 WL 12356743, at *9 (S.D.N.Y. Oct. 8, 2012) (noting that

courts have generally not applied *Janus* to claims under Section 17(a)(2) because, among other

reasons, the word "make" in Rule 10b-5(b) is not part of Section 17(a)(2)) (citing cases).[24]  The

SEC's Section 17(a)(2) claim should stand as to Nichols because, contrary to his assertions

---

[23]  The Complaint does not assert a claim against Bjorlin for violations of Section 17(a)(2).

[24]  This Court's decision in *SEC v. Kelly*, 817 F. Supp.2d 340 (S.D.N.Y. 2011), which pre-dates
*Reserve Fund* and the cases it cites, found that Section 17(a)(2) and Rule 10b-5 are sufficiently
similar that *Janus's* maker requirement should apply to Section 17(a)(2) claim.  *Id.* at 345-46.
That view does not appear to be shared by other courts in this District and the Second Circuit has
not yet decided the issue.  *Knight*, 2017 WL 2438179, at *2 n.2 (declining to address if *Janus* is
applicable to Section 17(a)(2) claims).  But, if this Court continues to hold that view, then, for all
of the reasons stated in Point II.B., the Court should  also find that the Complaint adequately
states a Section 17(a)(2) claim against Lidingo and Hodge because the Complaint allege that
each was a "maker" of at least certain of the at-issue statements.

(Nichols Br. at 8), the Complaint *does* allege that he received money or property by virtue of his

untrue statements.[25]

### E.     The SEC Has Adequately Plead Bjorlin's Liability<br>As A Control Person Of Lidingo (Count XV)

Bjorlin does not dispute that the Complaint contains allegations sufficient to establish

that, as the sole owner, operator, managing member and member of Lidingo (Cmpt. ¶ 8), she was

a controlling person of Lidingo.  Her sole argument against control person liability under

Exchange Act Section 20(a) is that there must be a primary violation by the controlled person.

Lidingo Br. at 12.  If this Court finds that the Complaint adequately states a claim against

Lidingo for violations of Exchange Act Section 10(b) and Rules 10b-5(a), (b) and/or (c),

Bjorlin's sole argument for seeking dismissal of Count XV vanishes.

### F.     The Complaint Adequately Pleads, In the Alternative, That<br>Lidingo And Bjorlin Violated Section 20(b) Through Writers (Count XVI)

Section 20(b) makes it "unlawful for any person, directly or indirectly, to do any act or

thing which it would be unlawful for such person to do under the provisions of this title or any

rule or regulation thereunder through or by means of any other person."  15 U.S.C. § 78t(b).  It is

a provision that creates primary liability for any actor who, through an intermediary, commits an

act that, if done themselves with the requisite state of mind, would violate the law.  The SEC

charged Bjorlin and Lidingo with Section 20(b) violations because, while Bjorlin is not alleged

to have written or published any of the at-issue articles herself, and she was not charged under

---

[25]  It is reasonably inferable from the Complaint that Lidingo hired Nichols only because he agreed to join the scheme and remain silent about compensation, thereby disguising the promotional nature of articles he wrote and published; and, if he had not agreed to do so, Lidingo would not have hired him.  Cmpt. ¶¶ 26, 33-39.  Moreover, the Complaint alleges that (i) his goal in writing for Lidingo was to have an impact on the issuer's stock price and (ii) on at least two occasions, he bought shares of issuers before his articles were published, and sold such shares at a profit immediately thereafter.  Cmpt. ¶¶ 54, 59-60, 81, 89.

Exchange Act Rule 10b-5(b), she knowingly or recklessly used third-party writers to do so on her behalf for the benefit of her (and Lidingo's) issuer-clients.

Bjorlin and Lidingo, who accuse the SEC of trying to do an "end run" around the holding in *Janus* with its Section 20(b) claim,[26] argue that Section 20(b) applies only to control persons and that the claim fails because (i) Lidingo cannot control itself and (ii) the SEC's control person claim against Bjorlin under 20(a) claim fails, so, its Section 20(b) claim must too.  Lidingo Br. at 12-13.  But, as set forth below, Section 20(b) is not a control person statute and this Court should not adopt the Sixth Circuit's reasoning in *SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974), which is flawed, avoids the plain language of the statute, and has been called into question by subsequent legislation.

### 1.   The Complaint Satisfies The Elements Of A 20(b) Claim

To defeat a motion to dismiss its claim under Section 20(b), the SEC need only allege that Lidingo and Bjorlin (i) acted through or used another person to execute at least some of the actions forming the basis of the substantive violation (here Exchange Act Rule 10b-5(b)) and (ii) acted with the state of mind necessary to establish the substantive violation.  The SEC has done this.

The Complaint alleges that Bjorlin and Lidingo hired writers to publish articles about their issuer-clients and pressured such writers to conceal their compensation or falsely state that they were not compensated, thereby hiding from unsuspecting investors the fact that the articles were paid-for promotions of the issuer and concealing the writer's conflict of interest.  Cmpt. ¶¶

---

[26]  This characterization is without merit.  The Supreme Court in *Janus* expressly recognized that Exchange Act Section 20(b) could be used to impose primary liability on a person who, though not the maker of a misleading statement, caused another person to be the maker.  564 U.S. at 146 n.10 ("We do not address whether Congress created liability for entities that act through innocent intermediaries in [§ 20(b)]."); *see also id.* at 157 (Breyer, J. dissenting) ("footnote [10] hints, that § 20(b) could provide a basis for liability in this case").

4, 36- 38, 40.  Stated differently, Lidingo and Bjorlin knowingly or recklessly commissioned, funded and arranged for the broad distribution of materially false and misleading information through or by means of articles published by third persons that were intended for prospective investors, which would have been unlawful under Exchange Act Rule 10b-5(b) for Lidingo and Bjorlin to do directly.  Cmpt. ¶ 172.  Nothing more is required to state a claim under Section 20(b).

### 2.   Control Is Not Required For Section 20(b) Liability

The Sixth Circuit's decision in *SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974) – which imputed a control element into a Section 20(b) claim (Lidingo Br. at 12) – was based on a unique (and arguably now antiquated) view of the Exchange Act's control provisions to which the Second Circuit has never subscribed.  Specifically, the Sixth Circuit, unlike the Second Circuit, considered Section 20(a) to set forth the standard of liability of a control person to a *private person* suing to vindicate his or her private interest.[27]  *Coffey*, 493 F.2d at 1318.  By contrast, it considered Section 20(b) to set forth "the standard of lawfulness to which a controlling person must conform, on penalty of liability in injunction to the SEC or criminal prosecution."  *Id.* at 1318.  Despite no reference to "control" in Section 20(b), the Sixth Circuit rationalized that the SEC is not a "person" under Section 20(a), that Sections 20(a) and 20(b) are parallel provisions, and that a "control" requirement should be imposed in Section 20(b) or "every link in a chain of

---

[27]  The Second Circuit has long held that Section 20(a) is available to the SEC in enforcement proceedings.  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975); *see also, e.g., SEC v. Montle*, 53 F. App'x 144, 144 (2d Cir. 2002); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1461 (2d Cir. 1996); *SEC v. DiMaria*, 207 F.Supp.3d 343, 360 (S.D.N.Y. 2016); *SEC v. Syndicated Food Serv. Int'l, Inc.*, No. 04 CIV. 1303 NGG VMS, 2014 WL 2884578, at *5 (E.D.N.Y. Feb. 14, 2014), report and recommendation adopted, No. 04-CV-1303 NGG VLS, 2014 WL 1311442 (E.D.N.Y. Mar. 28, 2014); *SEC v. Shehyn*, No. 04 CV 2003 LAP, 2010 WL 3290977, at *6 (S.D.N.Y. Aug. 9, 2010).

command would be personally criminally and civilly liable for the violations of inferior corporate agents." *Id.*

As the Sixth Circuit's rationale in *Coffey* is faulty and potentially outdated, Bjorlin's and Lidingo's request that this Court impute a control element into the SEC's Section 20(b) claim should be rejected:

- First, on its face, Section 20(b) does not impose a control requirement.[28]

- Second, adhering to the plain language of Section 20(b) does not lead to an absurd or unworkable result.[29] The Sixth Circuit expressed concern that, absent a control requirement, an innocent superior officer of a corporation would unfairly be held secondarily liable for the actions of downstream subordinates who commit a primary violation. *Id.* at 1318. But, the plain language of Section 20(b) protects against that result by requiring a plaintiff to establish that the superior officer acted with the *requisite state of mind* to commit the primary violation albeit through another person. By contrast, if a control requirement were imputed into Section 20(b), a superior officer who, acting with scienter, persuades or misleads an innocent secondary person to engage in unlawful conduct on his behalf, would escape liability.[30]

- Third, Congress obviously did not intend to impose a control requirement in both Sections 20(a) and 20(b). Section 20(a) explicitly uses the word

---

[28]  It is well-established that "when [a] statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (same); *U.S. v. Am. Trucking Ass'ns*, 310 U.S. 534, 543-44 (1940).

[29]  *See note* 28.

[30]  The Sixth Circuit's rationale in *Coffey* also conflicts with the Supreme Court's discussion of Section 20(b) in *Dirks v. SEC*, 463 U.S. 646 (1983). In *Dirks*, the Court was asked to consider whether a defendant had violated Exchange Act Rule 10b-5 by providing material non-public information he gained during an investigation to individuals who he did not control who traded based on that information. In concluding that the defendant had not violated the federal securities law, because he had no duty to the company, the Court suggested in dicta that liability could have been premised on Section 20(b) instead. *Id.* at 659 (citing Section 20(b), 15 U.S.C. § 78t(b), for the proposition that insiders not only are "forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they may not give such information to an outsider for the same improper purpose of exploiting the information for personal gain").

"control" whereas Section 20(b), which was enacted at the same time, does not. *Compare* 15 U.S.C. § 78t(a) *with* 15 U.S.C. § 78t(b).[31]

Additionally, as mentioned, the validity of *Coffey's* holding has been called into question by subsequent legislation.  In 1975, the Exchange Act was amended to include government agencies as a "person" and the Dodd Frank Act of 2010 amended Section 20(a) to specifically provide for controlling person liability to the Commission.  *See Securities Reform Act*, Pub. L. No. 94-29, 89 Stat. 97, Section 3 (1975); *Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203, 124 Stat. 1376, Section 929P(c) (2010).

For the reasons above, control is not a necessary element for a Section 20(b) violation. *SEC v. Strebinger,* 114 F. Supp. 3d 1321, 1334-35 (N.D. Ga. 2015) (control not necessary).[32]

## III.   THE COMPLAINT's ALLEGATIONS OF NICHOLS' SCIENTER SATISFY FED. R. CIV. P. 9(b)

Nichols also contends the Complaint's fraud claims (Counts I through VI) and aiding and abetting claim (Count XIV) should be dismissed against him because the SEC failed to plead

---

[31]  Indeed, the legislative history of Section 20(b) reflects that Congress had included the word "control" in the original proposal of the statute but later removed it from the enacted legislation, which is strong evidence of Congress' intent that Section 20(b) should not be limited to relationships involving control.  *See* S. 2693 73rd Cong. § 19(b) (2d Sess. 1934), *reprinted in* 11 LEGISLATIVE HISTORY OF THE SECURITIES ACT OF 1933 AND SECURITIES EXCHANGE ACT OF 1934, at 37-38 (2001) (as reported by S. Comm. On Banking and Currency, Feb. 9, 1934) (Proposed Section 11 [subsequently renumbered as 20(b)] provided, "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do … through or by means of any other person who is controlled by such person by or through stock ownership, agency, or otherwise....").  The court should presume that Congress acted intentionally and purposely in the disparate inclusion or exclusion.  *Russello v. U.S.*, 464 U.S. 16, 23 (1983); *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).

[32]  Bjorlin and Lidingo cite to *Shemian v. Research in Motion, Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014), which without any analysis or citations, states that Section 20(a) and 20(b) claims require control and dismisses for a lack of primary violation.  The Second Circuit itself, however, has not addressed whether Section 20(b) requires control. And for the reasons discussed above, control should not be prerequisite because, it is not appropriate to disturb Congressional intent where, as here, a logical and not absurd result is achieved when the plain language of the statute is followed.

scienter with particularity.[33]  Nichols Br. at 2-8.  The vast majority of his arguments are premised

on disputed questions of fact; and, while he is free to take issue with the SEC's view of the

evidence as this case progresses, and to offer different interpretations of the evidence, a motion

to dismiss is not the proper vehicle for doing so.  All that is to be decided at the pleading stage is

whether the SEC has stated a proper claim.

The Complaint easily meets the Fed. R. Civ. P. 9(b) standard for pleading Nichols'

scienter.[34]  The Complaint alleges that Nichols received compensation for at least 90 articles; in

every one of those articles, he failed to disclose that he had been paid or the amount he received;

and in at least 50 of the articles, he affirmatively stated he was not being paid.  Cmpt. ¶ 55,

Appx. A.  The allegations of fraudulent intent are compelling:  in order to publish his articles,

Nichols had to specifically select and then then click on the radio button that said he was not

receiving compensation for the articles (Cmpt. ¶ 20), when, in fact, he was.  He thus had both the

motive and the opportunity to commit fraud.[35]

---

[33]  Nichols' assertion that "[a] claim for fraud involves scienter," Nichols Br. at 2, is correct as
far as the SEC's claims under Exchange Act Section 10(b) and Rule 10b-5 are concerned
(Counts I, IV-VI); but a showing of negligence suffices for claims under Securities Act Sections
17(a)(2) and 17(a)(3) (Counts II-III).  *See SEC v. Wey*, No. 15-cv-7116, 2017 WL 1157140, at *7
(S.D.N.Y. Mar. 27, 2017) (citing *Aaron v. SEC*, 446 U.S. 680, 695-697 (1980); *SEC v. Ginder,*
752 F.3d 569, 574 (2d Cir. 2014)).  Further, aiding abetting does not require "knowledge," it
requires allegations that the aider and abettor knowingly or recklessly provided substantial
assistance to the primary violator.  *Compare* Nichols Br. at 7-8 *with* 15 U.S.C. §78t(e).

[34]  Pursuant to the Court's Individual Practices and Procedures, Part IV.E., the SEC is not
reciting the standards for pleading fraud with particularity under Fed. R. Civ. P. 9(b).

[35]  The Complaint also alleges that Nichols ghost-wrote articles which Lidingo then published
using various pseudonyms, and strategized with Bjorlin and Hodge about doing this on a broader
scale once the investing public started to suspect that the same writer(s) were behind the more
frequently-used pseudonyms.  Cmpt. ¶ 58.  He did this despite Seeking Alpha's policy that
restricted users to one account.  Cmpt. ¶ 21.  Further, he published his articles with the end-goal
of moving the issuer's stock price and, on at least two occasions, he traded in the shares of
issuers he wrote about, in direct contravention of the advice he gave in those articles.  Cmpt. ¶¶
59-60.  These additional allegations give rise to a strong inference of his fraudulent intent.  His
arguments therefore should be rejected.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the SEC respectfully requests that the Court deny (i) all moving Defendants' motion to dismiss all claims as time-barred; (ii) Lidingo's motion to dismiss Counts I-III, IV-VI and XVI; (ii) Bjorlin's motion to dismiss Counts I, III-IV, VI, and XV-XVI; (iii) Hodge's motion to dismiss Counts I-III and IV-VI; and (iv) Nichols' motion to dismiss Counts I, II, IV-VI and XIV .

Dated:  July 24, 2017

<div style="margin-left: 40%;">

Respectfully submitted,

  */s/ Suzanne J. Romajas*
Suzanne J. Romajas
Patrick R. Costello
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5971
Email: RomajasS@sec.gov
Tel: 202-551-4473 (Romajas)

*Attorneys for Plaintiff*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, SUZANNE J. ROMAJAS, certify that, on July 24, 2017, I caused the foregoing

Plaintiff's Memorandum of Law in Opposition to The Lidingo Defendants' and Defendant

Nichol's Motions to Dismiss Certain Claims, to be served by CM/ECF on all counsel of record

and to be served by electronic mail on the party listed below:

Vincent Cassano
*Pro Se Defendant*
vinnycassano@hotmail.com

                                       ***/s/ Suzanne J. Romajas***
                                       Suzanne J. Romajas
                                       Assistant Chief Litigation Counsel
                                       Securities and Exchange Commission
                                       100 F Street, N.E.
                                       Washington, DC 20549-5971